UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CASE NO. 5:11-CV-00005-R

S.B., a minor child, by her
next best friend and mother, Dawnya Brown                                    PLAINTIFF

v.

BALLARD COUNTY BOARD
OF EDUCATION, et al.                                                         DEFENDANTS

## MEMORANDUM OPINION AND ORDER

This comes before the Court upon Plaintiff's Motion for a Preliminary Injunction (DN 3). Defendants have responded (DN 8) and Plaintiff has replied (DN 9). On January 26, 2011, an in-person hearing was held in Paducah, Kentucky. Edward Box was present for the Plaintiff; Regina Jackson and Michael Owsley appeared for Defendants. Terri Turner, official court reporter, recorded the proceedings. This motion is now ripe for adjudication. For the reasons that follow, Plaintiff's Motion is DENIED.

## BACKGROUND

Plaintiff is a minor and a junior in high school who, until recently, attended Ballard Memorial High School ("High School"). She has been placed in the Ballard County Alternative School ("Alternative School") for up to 90 days, following the below-described disciplinary concerns. Plaintiff now brings this action under 42 U.S.C. § 1983 and KRS § 158.150 petitioning for a preliminary injunction compelling her immediate reinstatement in the High School until she is afforded an adequate procedural hearing to determine if her punishment is warranted.

1

## STANDARD

"The granting or denial of a preliminary injunction is within the sound judicial discretion of the trial court." *Mason Cnty. Med. Ass'n v. Knebel*, 563 F.2d 256, 260-61 (6th Cir. 1977) (citations omitted). Courts rely upon four facts in determining whether to grant or deny a preliminary injunction:

> (1) Whether the plaintiffs have shown a strong or substantial likelihood or probability of success on the merits; (2) Whether the plaintiffs have shown irreparable injury; (3) Whether the issuance of a preliminary injunction would cause substantial harm to others; (4) Whether the public interest would be served by issuing a preliminary injunction.

*Id*. at 261 (citations omitted). The four factors should be "balanced[,]" are "not prerequisites that must be satisfied[,]" and "are not meant to be rigid and unbending requirements." *Am. Imaging Servs., Inc. v. Eagle-Picher Indus., Inc.*, 963 F.2d 855, 859 (6th Cir. 1992) (citations omitted). Federal Rule of Civil Procedure 52 "requires a district court to make specific findings concerning each of these four factors, unless fewer are dispositive of the issue." *In re DeLorean Motor Co.*, 755 F.2d 1223, 1228 (6th Cir. 1985) (citing *United States v. School Dist. of Ferndale*, 577 F.2d 1339, 1352 (6th Cir. 1978)); *see* Fed. R. Civ. P. 52.

## FINDINGS OF FACT

After closely scrutinizing the pre-hearing motions, the affidavits submitted with these motions, and the testimony from the in-person hearing, the Court makes the following findings of fact.

### I. The Relevant Events from December 11, 2010, to January 3, 2011

Through an anonymous call placed to the school district's tip-line over the weekend of December 11 and 12, 2010, officials for the Ballard County Schools learned that a student

("Student X") had sold prescription medications[1] ("pills") on December 10 at the High School. DN 8-7 at 1. The following Monday, December 13, 2010, the assistant High School principal, the guidance counselor, and a school resource officer began an investigation of the alleged distribution. *Id*. Student X was questioned about the incident and confessed to selling five pills to another student ("Student Y"). *Id*. at 2. Student X also revealed that Student Y had purchased one of the pills for Plaintiff. *Id*. Student X wrote and signed a statement to that effect. *Id*.

According to High School principal Donald Shively's affidavit and testimony, Student Y and Plaintiff were then questioned separately about the alleged sale of December 10. *Id*. In a discussion with Shively, Student Y admitted that she purchased the pills and that one was for Plaintiff. *Id*. While Shively spoke with Student Y, the guidance counselor interviewed Plaintiff alone. *Id*. Plaintiff denied purchasing or taking possession of a pill, but she did admit that she knew of Student X's sale of the pills to Student Y. *Id*. After the guidance counselor asked, Plaintiff wrote out this version of the events in a statement and signed it. DN 8-12.

Shively and the guidance counselor then spoke together with Plaintiff. They told her of Student X's and Student Y's allegations, read their written statements implicating Plaintiff, and told Plaintiff that this infraction constituted a level-4 violation of the High School's Code of Conduct ("Code"). DN 8-7 at 2. They then asked her to provide the names of other students who might exonerate her. *Id*. Plaintiff gave them the names of two students. Shively then proceeded to interview these students while Plaintiff waited in in-school detention. Although one of the Plaintiff's witnesses said she had not seen anything, the other student ("Student Z")

---

[1] The pills were later identified as Loritabs, a prescription pain medication and a controlled substance.

3

actually confirmed the assertions of Student X and Student Y, saying that he had seen Plaintiff receive a pill from Student X. *Id*. at 3. Student Z also wrote a written statement to that effect. *Id*.

Following his conversations with Student Z, Shively spoke anew with Plaintiff, recounting Student Z's statement, whereupon Plaintiff repeated her claims of innocence. *Id*. Nevertheless, Shively indicated that as three students had specifically stated that she had purchased a pill, the High School's investigation was closed. *Id*. Shively relayed to Plaintiff that her purchase of the pill was a level-four violation of the Code and that she would be placed in the Alternative School for 90 days. *Id*. Shively also told Plaintiff that with good behavior, this punishment could be cut by a third. *Id*.

On December 14, Shively met with Plaintiff and her mother, reviewing the previous day's investigation and explaining Plaintiff's punishment. DN 8-8 at 1. Shively testified that at this meeting, he told Plaintiff and her mother that she was being placed in the Alternative School for up to 90 days, that this punishment would not appear on her permanent record, and that with good behavior Plaintiff would be eligible to return to the High School in 60 days.[2] In that meeting, Plaintiff identified a new student who could provide exculpatory testimony and at the mother's request, Shively reopened the investigation. *Id*. School officials again spoke with Student Z, who reaffirmed his previous story and wrote a second, more detailed account of what he had witnessed. *Id*. The newly-mentioned student was not interviewed, as she did not have

---

[2] There was some discrepancy whether Shively told Plaintiff and her mother that she was "suspended." Shively and the guidance counselor, also present at the meeting, stated that this word was not used to characterize Plaintiff's punishment; Plaintiff testified to the contrary. For the purposes of this motion though, the differences between what the parties each claim is immaterial.

4

first-hand knowledge of Plaintiff's innocence or guilt.[3]  *Id*.

With the previous day's investigation confirmed, Shively then informed the Plaintiff and her mother that the decision as to her punishment was final, set to commence the following day, and that Plaintiff should report to Alternative School rather than her normally scheduled classes. *Id*. Shively also relayed to Plaintiff's mother that if they were dissatisfied with his decision, the Code permitted them to appeal the disciplinary action to the superintendent and then to the local school board. *Id*. Although Plaintiff's parents and their attorney attended a grievance hearing held on January 3, 2001, they left before the meeting ended and chose not to pursue the issue further in that venue.

## II. The High School's Code of Conduct

The Code classifies infractions on a scale from one to four, the latter being the most severe. The Code says that a level-four violation "includes acts that result in violence or which pose a direct threat to the safety or health of self, other persons or property in the school." DN 8-3 at 17. It continues, stating that level-four violations "may be so serious that they require administrative actions that result in the immediate removal of the student from school." *Id*. Three punishments may be imposed at the principal's discretion in level four:

> a. Long-term placement of 45-90 days (alternative placement)
> b. Expulsion with services of 90-177 days (alternative placement)
> c. Expulsion without services (student poses threat to the safety of himself and others)

---

[3] As best as the Court can determine from the testimony at the hearing, the new witness that Plaintiff brought to the school officials' attention did not see the alleged sale firsthand. Rather, this witness was simply told by Plaintiff earlier on December 10, 2011, that she had refused to purchase a pill from Student X during breakfast at the High School.

5

*Id.* In Plaintiff's case, Shively opted for a long-term placement of 90 days in the Alternative School, the least severe option under Level 4.[4] According to the testimony of Shively and the county superintendent of schools, this is the punishment consistently given to students who possess controlled substances on the High School's property.

During her assignment to the Alternative School, Plaintiff may not participate in extracurricular activities such as softball or school-sponsored social events, like dances. Plaintiff argues that her hope of receiving a softball scholarship following her senior year will be greatly hindered by this punishment, as the first game of the softball season is scheduled on March 22, 2011. If not shortened by the school board, her 90-day punishment would terminate near the close of the season, effectively foreclosing any opportunity she has of playing this year.

### **III. The Alternative School**

The Alternative School is located in a separate building on the grounds of the High School. DN 8-18 at 1. Middle-school and high-school students who attend the Alternative School do so for disciplinary reasons, separated from their regular classes and teachers. However, the students maintain their regularly scheduled classes are provided the corresponding assignments from their normal teachers. Homework, quizzes, and exams are completed by the students in the Alternative School, turned into the supervising teacher, and then graded by their normal teachers. *Id.* If certain equipment is necessary for a student to complete a project yet unavailable in the Alternative School (such as laboratory equipment), the student is typically allowed to complete that project in their regular classroom during their teacher's planning

---

[4] According to testimony at the hearing and pursuant to state law, the latter two punishments, expulsion with and expulsion without services, may only be implemented after the school board holds a hearing before which the student appears. *See* KRS § 158.150(6).

period.

The Alternative School is supervised by a licensed teacher. This teacher is available to assist these students with their course load. *Id*. at 2. As the number of students attending the Alternative School is typically small, individual attention for a struggling student is realistic and routine. *Id*. In addition, math and science teachers teach lessons to the students in the Alternative School twice a week and if a particular student continues to struggle in a subject, their normal teacher typically makes arrangements to see the student for a one-on-one lesson. *Id*. Finally, students were provided weekly access to counselors from the Four Rivers Behavioral Health Center in the 2010-fall semester. The counselors spoke with the students individually and lead character-building exercises for the group. *Id*. at 2.

Since joining the Alternative School, Plaintiff has completed her assignments on time and her requests for additional help have been answered promptly. She has incurred no disciplinary infractions and her grades have shown some improvement. *Id*. at 3.

## CONCLUSIONS OF LAW

Considering the factual findings, the Court concludes that Plaintiff has failed to demonstrate three of the four requirements necessary for a preliminary injunction. As such, injunctive relief is inappropriate.

### **I. Likelihood of Success on the Merits.**

Plaintiff largely claims that because of the actions of school officials, she has been deprived of her procedural due process rights under the Fourteenth Amendment as well as under KRS § 158.150. Upon review of the legal precedent governing these claims, the Court finds that Plaintiff is unlikely to succeed on the merits of her case.

The Commonwealth of Kentucky has recognized the fundamental right to a public education for all its citizens. *Rose v. Council for Better Educ., Inc.*, 790 S.W.2d 186 (Ky. 1989). One's right to a free public education under Kentucky law is a property right protected by the Fourteenth Amendment. *Laney v. Farley*, 501 F.3d 577, 580-81 (6th Cir. 2007). A student's suspension from a public school implicates their due process rights under the Fourteenth Amendment. *Goss v. Lopez*, 419 U.S. 565, 580-82 (1975). In a suspension of ten days or less from school, due process dictates that before the punishment is carried out, "a student should be given oral or written notice of the charges against him, and if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Id.* at 581. Kentucky law follows this general framework in describing the process due to suspended students:

> A pupil shall not be suspended from the common schools until after at least the following due process procedures have been provided:
> (a) The pupil has been given oral or written notice of the charge or charges against him which constitute cause for suspension;
> (b) The pupil has been given an explanation of the evidence of the charge or charges if the pupil denies them; and
> (c) The pupil has been given an opportunity to present his own version of the facts relating to the charge or charges.
> These due process procedures shall precede any suspension from the common schools unless immediate suspension is essential to protect persons or property or to avoid disruption of the ongoing academic process. In such cases, the due process procedures outlined above shall follow the suspension as soon as practicable, but no later than three (3) school days after the suspension.

KRS § 158.150(5). Kentucky law further requires that the expulsion of a student is only appropriate after a hearing before the district's school board. *Id.* § 158.150(6).

The thrust of Plaintiff's argument is that her relegation to the Alternative School is effectively a ninety-day suspension or expulsion. If this were the case, the above-stated legal

precedent and the Code alike would mandate a different due process procedure than the one that was originally provided to Plaintiff. However, where a student is transferred to another school for disciplinary reasons, this and other circuits have held that the concerns over procedural due process afforded the student are only implicated in certain limited circumstances. *See e.g.*, *Wayne v. Shadowen*, 15 F. App'x 271, (6th Cir. 2001); *Nevares v. San Marcos Consol. Indep. Sch. Dist.*, 111 F.3d 25, 26 (5th Cir. 1997); *Buchanan v. City of Bolivar, Tenn.*, 99 F.3d 1352 (6th Cir. 1996); *C.B. v. Driscoll*, 82 F.3d 383, 389 (11th Cir. 1996).

In *Buchanan v. City of Bolivar, Tenn.*, a student was arrested on school property for throwing rocks at passing cars. 99 F.3d at 1354. Following his release from police custody, the student was given the choice whether he wanted to serve a ten-day-at-home suspension or attend an alternative school for ten days. *Id.* at 1355. Although he chose the alternative school, the student later challenged the notice and opportunity to be heard he was given before his punishment was rendered. *Id.* at 1359. Ultimately the sixth circuit decided that an insufficient record was available from the district court to determine what type of process the student had been provided. *Id*. However, the court opined that with regard to the action of sending the student to an alternative school, he "may not have [had] procedural due process rights to notice and an opportunity to be heard." *Id*. The court continued, saying that "absent some showing that the education received at the alternative school is significantly different from or inferior to that received at his regular public school," the student did not enjoy the same rights provided under *Goss* had he been suspended. *Id*. A number of courts have cited *Buchanan* for the proposition that students sent to alternative schools for disciplinary reasons do not have an absolute procedural due process right to challenge the decision. *See e.g.*, *Marner v. Eufaula City School*

9

*Bd.*, 204 F. Supp. 2d. 1318, 1324 (M.D. Ala. 2002); *Fortune ex rel. Fortune v. City of Detroit Pub. Schools*, No. 248306, 2004 WL 2291333, at *3 (Mich. Ct. App. Oct. 12, 2004).

The sixth circuit came to a very similar conclusion in *Wayne v. Shadowen*. Here, a student was disciplined for sexually harassing a female student in his class. *Wayne,* 15 F. App'x at 278-79. After school officials assigned him to an alternative school for five months following a ten-day suspension, the student brought an action challenging the process that had been provided him and demanding a formal hearing before the school board on the matter. *Id*. at 278-79. The court rejected his arguments that being forced to attend the alternative school was a constructive expulsion. *Id*. at 290. In so deciding, the court stated the following:

> Patently, [attending the alternative school] was not tantamount to permanent and complete expulsion from the school system. [The student] would have received all of the basic fundamentals of a "proper and an adequate education" while in the [alternative school], with the added benefit of a monitored, disciplined environment . . . .

*Id*. The court then specifically cited *Buchanan* in stating that the education this student received in the alternative school was "neither 'significantly different from,' nor 'inferior to,' that which was available in the traditional classrooms."[5] *Id*. (citing *Buchanan*, 99 F.3d at 1359).

Although *Buchanan* and *Wayne* are factually dissimilar from the instant matter, the law provided in these decisions is the best guidance the Court has from the sixth circuit. Reading the cases in tandem leads the Court to the following three conclusions. First, Plaintiff's placement in the Alternative School for 90 days is not equivalent to a suspension or expulsion. Indeed, it is

---

[5] The court in *Wayne* approved an alternative school with very similar attributes as the one this Court examines today. *Wayne*, 15 F. App'x at 275-76. Furthermore, the *Wayne*-court astutely pointed out that while Kentucky law obligated that children receive a "proper and adequate education","state law did not entitle [children] to the best possible education attainable, nor to instruction administered under ideal conditions." *Id*. at 285.

markedly different. Plaintiff is not being denied her right to education as afforded to her under Kentucky law; simply, she has been put into another academic environment as a condition of her punishment. Not only is *Wayne* rather explicit on this point, *Id*. at 290, but the decision is not alone in deciding that placement in an alternative educational environment is not tantamount to a suspension or expulsion. *Marner*, 204 F. Supp. at 1324 (45 day placement in an alternative school was not constructive suspension). Ergo, the Court finds that Plaintiff's placement in the Alternative School is not a suspension or expulsion.

Second, the Court finds that Plaintiff's reassignment to the Alternative School does not implicate her procedural due process rights, as the education she is receiving is not "significantly different from or inferior to that received at [her] regular public school." *Buchanan*, 99 F.3d at 1359. The record indicates that while Plaintiff is isolated from her regular classmates and teachers, she is being assigned normal work and receiving individualized attention from the teacher/supervisor of the Alternative School. She is also being graded against her regular class, so her permanent record will not be altered as a result of her punishment. Special accommodations can be made for her if she requires further assistance, allowing her to receive tutoring from her normal teachers on difficult subjects. Although Plaintiff claims the Alternative School does not provide for tutoring in chemistry, physics, and geometry, this contention is directly controverted by Shively, who set forth in his affidavit and testimony that teachers arrange to meet alone with students that require extra help. DN 8-8 at 3. Plaintiff further complains that her attendance of the Alternative School translates into her exclusion from softball, a sport she has played since middle school. The Court sympathizes with Plaintiff's desire to play on her High School softball team. Yet, playing softball is a privilege; Plaintiff

11

does not "have a general constitutional right to participate in extracurricular athletics." *Lowery v. Euverard*, 497 F.3d 584, 588 (6th Cir. 2007) (citations omitted); *see Crocker v. Tenn. Secondary Sch. Athletic Ass'n*, 980 F.2d 382, 387 (6th Cir. 1992) ("The main purpose of high school is to learn science, the liberal arts and vocational studies, not to play [sports]."). Overall, the Court believes both that Plaintiff is receiving a sufficiently equivalent education in the Alternative School and that any concerns she may harbor about losing a college scholarship to play softball are speculative at best. Accordingly, under *Buchanan*, she is not entitled to further procedural due process challenging the disciplinary decision.

Third, the Court concludes that even if Plaintiff was due some form of notice and opportunity to be heard before being sent to the Alternative School, the procedure that she was given on December 13 and 14, 2010, was adequate. During the High School's investigation, Plaintiff was confronted with the written statements of other parties that implicated her; following this, she was given an opportunity to explain her side of the story and provide witnesses that would verify her claims. Before her punishment was finalized, school officials met with Plaintiff and her mother and explained the evidence against her. At the mother's request, Shively conducted a further investigation that confirmed the previous evidence against Plaintiff. Only then was the punishment finalized and Plaintiff placed in the Alternative School for up to 90 days. Plaintiff's mother was then notified that she could appeal the decision through the appropriate channels. For suspensions of ten-days or less, all the law requires is that the student be "given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence that authorities have and an opportunity to present his side of the story." *Goss*, 419 U.S. at 581. Considering the Court's previous decision that Plaintiff was not

suspended or expelled, the procedure provided appears aptly reasonable considering the circumstances. *See e.g.*, *Wayne*, 15 F. App'x at 290-91 (similar procedure sufficient after sending student to alternative school for five months); *Nevares*, 111 F.3d at 26 (transfer of student to alternative school upheld with similar process provided); *Casey v. Newport School Comm.*, 13 F. Supp. 2d 242, 246-47 (D.R.I. 1998) (removal of disruptive student permanently from science class upheld with similar procedure). That Plaintiff has maintained her innocence throughout this matter is inapposite; as she has not been suspended or expelled, she is not due a full-blown hearing before the school board determining her guilt or innocence as to the allegations against her.

For these reasons, the Court concludes that neither Kentucky nor federal law entitles Plaintiff to a hearing before the school board, or any other disciplinary body for that matter, allowing her to challenge her assignment to the Alternative School for 90 days. As it is unlikely that Plaintiff will succeed on the merits of this matter, her preliminary injunction is inappropriate.

### **II. Irreparable Harm**

The next factor Plaintiff must show is whether absent the preliminary injunction, she will suffer some irreparable injury. In support of this, Plaintiff contends that her exclusion from the following activities will cause her irreparable harm: (1) tutoring in chemistry, physics, and geometry, (2) softball, and (3) other school functions like "basketball games, dances, or other extracurricular activities." DN 3-1 at 5-6. She also states that her placement in the Alternative School will harm her reputation. DN 9 at 7-8.

As explored above, Plaintiff's concerns are either without factual or legal merit. The Alternative School provides her with sufficient resources to complete her regularly assigned class work and receive additional aid should she require it. That she cannot participate in softball or other extracurricular activities is unfortunate, but something that does not implicate a constitutional deprivation. *Lowery*, 497 F.3d at 588. Plaintiff has also failed to provide any evidence that she is actively suffering reputational harm from her current circumstances. While she spoke at the hearing about the negative stigma felt by students enrolled in the Alternative School, her testimony fell far short of establishing a factual basis whereby this Court could conclude that Plaintiff will be saddled with long-term reputational harm as a result of her punishment. As Plaintiff has failed to show irreparable injury, her request for a preliminary injunction is improper.

### **III. Injunctive Relief in the Public Interest.**

Lastly, Plaintiff must show that it is in the public's interest for the Court to grant injunctive relief. Buttressing this argument, Plaintiff relays that the general public has a great interest in assuring the school board officials abide by the regulations they have established in the Code. Plaintiff consumed a healthy portion of the hearing arguing that the Code had been inconsistently applied to her. In particular, she stated that while her possession of the pill had been classified a level-4 infraction by Shively, her rather unblemished disciplinary record[6] merited that this behavior fall under level 3 instead. For their part, Defendants stated that the High School consistently used the level-4 guidelines to punish students in possession of

---

[6] It is undisputed that Plaintiff had never had serious disciplinary problem in the High School before this incident.

prescription narcotics on school grounds.

Plaintiff has not shown that injunctive relief is in the public's interest for two reasons. First, the actions of school officials comported with the Code. In describing the authority of the High School's principal to place students in the Alternative School, the Code reads as follows:

> Referral of a student [to the Alternative School] shall be made by the principal and/or designee. His/her decision shall be based on information received from teachers, counselors, administrators, other supervisory staff, the student himself or herself, or the judicial system. *The principal has the authority* to refer a student to alternative school for violations of numerous policies or discipline codes relating to students, or for repetitive minor infractions that are disruptive to the learning environment that could result in suspension or expulsion from school.

DN 8-3 at 26 (emphasis added). Moreover, the Code clearly classifies possession of controlled substances as either a level-3 or a level-4 violation. *Id.* at 19. These two sections, in conjunction, illustrate to the Court that Shively's actions conformed to the Code: he chose to characterize Plaintiff's behavior as a level-4 infraction and using his discretion, he referred her to the Alternative School for 90 days, a punishment allowed for under the Code. As it cannot be said that the High School is deviating from its previously established rules and regulations, it cannot be in the public's interest to grant Plaintiff's injunction for this reason.

Second, the Court agrees with Defendants that there is a significant public interest in school officials providing a safe, drug-free environment to educate the youth of a community. In describing the current drug problem at the High School during the hearing, the Ballard County superintendent of schools testified that of the past twenty-four expulsions from the High School, twenty-three were for the sale or possession of prescription medication. If school officials in Ballard County are to accomplish their primary mission of education, they must be able to confront and stamp out the illegal drug trade in their schools with quick and decisive action.

15

This can only be accomplished if school officials are able to discipline students in accordance with the provisions of the Code, without the fear that a court will substitute its will for their decisions. As the punishment levied in this matter was in conformity with the Code and issued only after a fair investigation of the incident, the Court finds that Plaintiff has not shown injunctive relief to be in the public's interest.

## CONCLUSION

For the foregoing reasons, **IT IS ORDERED THAT** Plaintiff's Motion for a Preliminary Injunction (DN 3) is **DENIED**.

cc: Counsel